Filed 12/14/20 In re Victoria O. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re VICTORIA O., a Person Coming Under the Juvenile Court Law. | B305231 (Los Angeles County Super. Ct. No. 19CCJP05807) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MARLENA P., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Sabina A. Helton, Judge. Conditionally affirmed and remanded with directions.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

Marlena P. (Mother) appeals from the juvenile court's disposition orders declaring 11-year-old Victoria O. a dependent of the court under Welfare and Institutions Code[1] section 300, subdivision (b)(1). Mother contends the juvenile court failed to comply with the inquiry provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) and state law. Although Conrad O. (Father) filed a parental notification form stating one or more of his parents, grandparents, or other lineal ancestors may be or was a member of a federally recognized tribe, neither the Los Angeles County Department of Children and Family Services (Department) nor the juvenile court made further inquiry with paternal relatives about Victoria's possible Indian status. Mother also challenges the disposition orders removing Victoria from her physical custody and granting her monitored visitation. We conditionally affirm the disposition orders and remand for the juvenile court and the Department to comply with the inquiry and notice provisions of ICWA and state law.

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Referral and Investigation*

On September 4, 2019 the Department received a referral alleging Mother, who had been diagnosed as suffering from schizoaffective disorder, was not taking her medication and was neglecting then-10-year-old Victoria.  Mother and Victoria had been living with maternal grandmother Mona L., maternal stepgrandfather Michael B., and a maternal aunt.[2]  But Mother reported she and Victoria became homeless that day because the relatives forced them to leave for no apparent reason.

Mother was diagnosed with paranoid schizophrenia in 2018.  In July 2019 Mona contacted the police after Mother physically assaulted a friend.  The police responded, and Mother was placed on a "5150 hold"[3] and hospitalized for three weeks.  Mother received psychotropic medication upon discharge from the hospital, but Mona and Victoria stated Mother did not take her medication.

Victoria reported that for the prior few weeks Mother had locked her in the bedroom with Mother, only allowing Victoria to leave to use the bathroom.  When Victoria used the bathroom, Mother would stand guard outside the bathroom door until

---

[2]    Mother reported Father was incarcerated in Orange County, but Mother did not know the name of the facility.  Father is not a party to the appeal.

[3]    Section 5150 authorizes peace officers and certain mental health professionals to hospitalize a person perceived to be a danger to herself or others for a 72-hour mental health evaluation.

Victoria exited the bathroom. Victoria stated, "I'm afraid of my mom. I never really liked her. I feel like I shouldn't trust her. I don't feel safe leaving [Mona's home] with [Mother]." Mona confirmed Mother locked Victoria in the bedroom with Mother and did not allow Victoria to leave the room. Mona did not report Mother's behavior because Victoria told Mona she was fine when Mona called her on her cell phone.

Mother denied she ever locked Victoria in her bedroom. Mother accused Michael and maternal uncle Paul P. of sexually abusing Victoria, but she then added, "This may be all in my head." Victoria stated no one had molested or inappropriately touched her. Victoria also denied ever having consensual sex, stating, "No, it's all in [Mother's] head." Victoria reported the prior day Mother took her to the hospital to get a pregnancy test. Victoria did not know why Mother believed she was pregnant.

Mona denied Mother's sexual abuse allegations, stating Mother "always makes these allegations." Mona reported that a month earlier Mother had slapped her in the face and punched Michael in his face. In addition, Mona had contacted law enforcement on September 4 because Mother came to her home and began banging on the walls. Law enforcement instructed Mother to leave, but Mother returned at 4:00 a.m.

B.    *The Detention and Petition*

On September 6, 2019 the Department filed a petition alleging Victoria came within the jurisdiction of the juvenile court under section 300, subdivisions (a) and (b)(1). The petition alleged in counts a-1 and b-2, as later amended, that Mother had a history of engaging in violent alterations by slapping Mona on one occasion and striking Michael in the face on another occasion.

4

Mother's violent conduct against Mona and Michael endangered Victoria's physical health and safety. Count b-1 alleged Mother had mental and emotional problems, including a diagnosis of paranoid schizophrenia, which rendered her unable to provide regular care for Victoria and endangered Victoria's physical health and safety. Count b-3 alleged Father had a history of substance abuse, was a registered narcotics offender, and was currently incarcerated for drug-related crimes and other criminal activities. Father's use of illicit drugs and criminal activities placed Victoria at risk of physical and emotional harm.

At the September 9, 2019 detention hearing, the juvenile court detained Victoria from Mother's custody and granted Mother monitored visits for a minimum of three hours per week. At the request of minor's counsel, and after a home assessment by the Department, Victoria was placed with Mona and Michael. On September 26 Mona and Michael obtained a restraining order protecting them from Mother.

C. *The Jurisdiction and Disposition Report*

According to the October 11, 2019 jurisdiction and disposition report, Victoria was happy living with her grandparents and returning to her school. Victoria reported "it was not good" when she lived with Mother. According to Victoria, Mother rarely took her medication. Victoria added, "I saw her talk to herself. It didn't make sense. She would laugh randomly." Victoria was scared of Mother. Mother "stayed up all night" and would "say that she saw something but it did not happen." Victoria added, "She thought my grandpa touched me. It was not true."

According to Mona, Mother suffered from paranoia and started yelling at her after Mother stopped taking her prescribed medication in May 2019. On one occasion, Mother banged dishes and kitchen cabinets all night and slapped Mona for no reason. Mother explained she slapped Mona because she saw Mona holding a knife. Victoria was asleep and did not come out of her bedroom when Mother became aggressive towards Mona and Michael.

Michael stated he was cleaning a bedroom when Mother came and punched him in the eye with no explanation. Mother hit him hard enough to cause a black eye. Mother then went to the living room and started throwing things and telling Michael to leave. Michael left the apartment because Mother would not calm down. When he returned that evening, Mother threw his belongings in the swimming pool, which was directly below their apartment. Mother said to the social worker, "I had to punch him in the eye because they jumped me." Mother added, "They want to take my daughter. That's why they jumped me."

Michael reported Mother came to their apartment in September 2019 before Victoria was placed with Mona and Michael. Mother could not get in through the front door, so she tore off the screen from the kitchen window and pulled out the blinds. Mona called the police, and when the police arrived they told Mother if she came back, they would arrest her. Mother told the police she did not care. Mona and Michael reported Mother again came to their apartment complex after Victoria was placed in their home. Mother was unable to enter the apartment complex because it was gated. Mother contacted the police and falsely reported Victoria was not in school. Since that incident, Mother has not returned to Mona and Michael's apartment.

6

Mother reported she lived in an apartment by herself, and she took medication once a day. Mother was not participating in mental health services because she had recently moved and was looking for a mental health facility. Mother said she had a strained relationship with both Mona and Michael. When Mother was asked about her perceived needs, she stated, "Get away from my parents, my mother."

D.      *The Jurisdiction and Disposition Hearings*

At the November 22, 2019 jurisdiction hearing, the juvenile court sustained the allegations in the first amended petition under section 300, subdivisions (a) and (b)(1). The disposition hearing was continued to allow the Department additional time to investigate Father's claim that one of his great-grandparents may have been a member of a federally recognized tribe.

Prior to the disposition hearing, the social worker reported Mother worked for a blind couple and their four children and lived in their home. Mother was receiving mental health services and meeting with a psychiatrist. Mother also was working with a housing specialist to find housing. On January 27, 2020 Mother was again hospitalized for mental health issues. Mother reported she was hospitalized because she was not feeling well as a result of her medications. Mother had visits with Victoria once a week at the park, monitored by Michael. Mona reported the restraining order against Mother had expired.

At the February 26, 2020 disposition hearing, the juvenile court found ICWA did not apply. For disposition, minor's counsel argued Victoria was at risk if she were released to Mother because of Mother's paranoia, which caused her to lock Victoria in the bedroom, and the domestic violence between Mother and

the maternal grandparents. Minor's counsel added, "I was able to speak with the maternal grandparents as things seem to have been getting better between them, but at this time they would not be in support of Mother moving in just based on Victoria not being comfortable at this time." Mother's counsel asserted Mother was engaged in services and taking her medication. Further, Mother's counsel stated Mona indicated she would be comfortable with visitation occurring in her home. Mother's counsel acknowledged "Victoria may not feel comfortable yet as what happened was pretty upsetting," but counsel argued there was no clear and convincing evidence of a likelihood of substantial harm or detriment if Victoria were returned to Mother's physical custody with family preservation and wrap around services. Mother's counsel added, "If the court is not inclined to make an order of home [of] parent today, [Mother] would be requesting an order she be allowed to reside with the maternal grandparents, not only home of parent order." The Department's counsel opposed Mother's requests.

The juvenile court declared Victoria a dependent of the court and removed her from Mother's physical custody. The court stated, "I'm encourage[d] by what I'm seeing, but I don't think it's safe for Victoria right now, and I think she has made her wishes clear at the moment. [¶] . . . Based on the facts found true in the sustained petition along with evidence considered, the court finds by clear and convincing evidence that remaining in the home of parents would pose substantial risk of detriment to the child's physical health, safety, protection and/or physical, emotional well-being. [¶] There is no reasonable means by which the child's health and well-being can be protected without removing the child from the parents' physical custody." The court ordered

8

Mother "to keep all psychiatric appointments, take all prescribed psychotropic medications," and participate in "individual counseling to address case issues with a licensed therapist [regarding] maintaining mental health wellness, history of psychiatric hospitalizations, mental health diagnosis, child protectiveness and the effects of mental health instability on children." The court also granted Mother monitored visitation for a minimum of three hours a week. Mother timely appealed.

## DISCUSSION

A. *The Department and Juvenile Court Failed To Comply with ICWA*

1. *The Department's investigation and ICWA notices*

At the September 9, 2019 detention hearing, Mother filed a parental notification of Indian status form (ICWA-020 form), stating she "may have Indian ancestry," but not providing any additional information. Mona stated her father's side may have American Indian ancestry (Cherokee), but she did not know if any relative was a member of a Cherokee tribe. The juvenile court ordered the Department to make further inquiry and to provide ICWA notice to the Cherokee Nation. On October 9 Mona provided information regarding her family's Indian heritage.[4]

---

[4] The record does not reflect what information Mona provided to the Department. On appeal Mother does not contend the Department failed to investigate Victoria's maternal ancestry.

9

At Father's arraignment on October 29, 2019, Father filed an ICWA-020 form, indicating "[o]ne or more of [his] parents, grandparents, or other lineal ancestors [(here Father inserted 'may')] is or was a member of a federally recognized tribe." Father did not identify a tribe. However, he provided the name and telephone number of paternal great-grandfather, Trinidad B. The court ordered the Department to interview Father and Trinidad B. and to "send out any appropriate ICWA notices on behalf of Father."

On October 31, 2019 the Department sent ICWA notices (ICWA-030 form) providing notice of the adjudication hearing to the Bureau of Indian Affairs, the Secretary of Interior, Cherokee Nation, Eastern Band of Cherokee Indians, and United Keetoowah Band of Cherokee Indians. The ICWA notices list Mother's and Father's names, current address, birthdates, and place of birth. The ICWA notices also identified Mona's name, current address and birthdate; maternal grandfather's name, birthdate and place of birth; and the maternal great-grandparents' names, birthdates, places of birth, and dates of death. No information was listed for the paternal relatives.

On November 12, 2019 Father told the social worker he did not know the name of the tribe with whom his family was registered, but he provided the telephone number of paternal grandmother Barbara O. The social worker called Barbara on November 13 and 14 and left voicemail messages for her. The social worker also tried to call Trinidad using the telephone number Father provided on the ICWA-020 form, but the number was no longer in service. At the November 22, 2019 hearing, the juvenile court ordered the Department to submit a report regarding its ICWA investigation and notices.

The Department reported as to its ICWA investigation that in a November 15, 2019 letter, the Eastern Band of Cherokee Indians stated based on the information provided by the Department, Victoria was "neither registered nor eligible to register as a member of this tribe." (Boldface omitted.) The social worker also spoke with a representative of the United Keetoowah Band of Cherokee Indians, who stated the tribe did not have an assigned person responsible for ICWA notices. On February 24, 2020 Cherokee Nation representative Traci Willie e-mailed the social worker, stating, "ICWA does not apply as neither the child nor the parents are enrolled members of the tribe. A letter has not been generated yet but will be once the received notice has been fully researched and processed. Due to some unfortunate circumstances, we have exceeded our normal 90-day response time but are working as quickly as we can." The social worker contacted the United Keetoowah Band of Cherokee Indians by e-mail, but she did not receive a response.

At the disposition hearing, the juvenile court read Willie's February 24 e-mail into the record. Then the court stated, "Based on that, I believe the ICWA investigation is complete. I'm going to find there is no reason to know the child is an Indian child within the meaning of ICWA. I find ICWA does not apply." At the request of minor's counsel, the court also found notice to the United Keetowah Band of Cherokee Indians was proper.

2. *ICWA inquiry requirements*

ICWA provides as to dependency proceedings, "[W]here the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of . . . an Indian child shall notify the parent or Indian custodian and the

11

Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention."  (25 U.S.C. § 1912(a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 5; *In re A.M.* (2020) 47 Cal.App.5th 303, 315.) California law similarly requires notice to the Indian tribe and the parent, legal guardian, or Indian custodian if the court or the Department "knows or has reason to know" the proceeding concerns an Indian child.  (§ 224.3, subd. (a); see *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 784; *In re Breanna S.* (2017) 8 Cal.App.5th 636, 649.)  The notice requirement is at the heart of ICWA because it "enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding.  No foster care placement or termination of parental rights proceeding may be held until at least 10 days after the tribe receives the required notice." (*In re Isaiah W.*, at p. 5; accord, *In re N.G.* (2018) 27 Cal.App.5th 474, 480; see 25 U.S.C. § 1912(a); § 224.3, subd. (d).)

The juvenile court and the Department "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W., supra*, 1 Cal.5th at p. 9; *In re A.M., supra*, 47 Cal.App.5th at pp. 316-317.)  The duty to develop the information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' family.  (*In re Elizabeth M., supra*, 19 Cal.App.5th at p. 784; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706 ["The court and the agency must act upon information received from any source, not just the parent [citations], and the parent's

12

failure to object in the juvenile court to deficiencies in the investigation or noticing does not preclude the parent from raising the issue for the first time on appeal . . . ."].)

As the Court of Appeal in *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052, explained, "[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the [a]gency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the [a]gency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply." (Accord, *In re D.F.* (2020) 55 Cal.App.5th 558, 566-568.)

Section 224.2, subdivision (e)(2), provides, "If the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, . . . the court, social worker, or probation officer shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." Further inquiry includes "[i]nterviewing the parents . . . and extended family members" to gather additional information as well as "[c]ontacting . . . any other person that may reasonably be expected to have information regarding the child's membership status or eligibility." (See Cal. Rules of Court, rule 5.481(a)(4); *In re A.M., supra*, 47 Cal.App.5th at p. 317; *In re K.R., supra*, 20 Cal.App.5th at p. 709 ["[A] social services agency has the obligation to make a

13

meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status."].)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence." (*In re D.S., supra*, 46 Cal.App.5th at p. 1051, citing § 224.2, subd. (i)(2) [finding that ICWA does not apply is "'subject to reversal based on sufficiency of the evidence'"]; accord, *In re D.F., supra*, 55 Cal.App.5th at p. 565.) The parent challenging the juvenile court's ICWA finding on appeal has the burden to show the evidence was not sufficient to support the finding. (*D.F.*, at p. 565; *In re Austin J.* (2020) 47 Cal.App.5th 870, 886.) "But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*D.S.*, at p. 1051; accord, *D.F.*, at p. 565.)

3.      *The Department and the juvenile court failed to satisfy their duty of further ICWA inquiry*

On the ICWA-020 form, Father stated one or more of his parents, grandparents, or other lineal ancestors may be or was a member of a federally recognized tribe. Father did not identify a tribe, but he provided the names and telephone numbers for the paternal great-grandfather (Trinidad B.) and paternal grandmother (Barbara O). Based on Father's statement of possible Indian ancestry, the Department and the juvenile court were required to make further inquiry under section 224.2, subdivision (e). (*In re M.W.* (2020) 49 Cal.App.5th 1034, 1044 [father's statement he may have Indian ancestry even though he could not identify the tribe, "trigger[ed] the provisions of section 224.2, subdivision (e), which required the court and the Department to make further inquiry as soon as practicable"]; *In*

14

*re A.M., supra*, 47 Cal.App.5th at pp. 309, 322 [mother's statement that she may have Blackfeet and Cherokee ancestry and that one of her lineal ancestors is or was a member of a federally recognized tribe required further inquiry by social services department into children's Indian ancestry]; contra, *In re Austin J., supra*, 47 Cal.App.5th at pp. 887-888 [Department was not required to inquire further into children's Indian ancestry based on mother's statements she may have Cherokee ancestry because her statements only created the possibility the children had Cherokee ancestry].)

The Department and the juvenile court failed to satisfy their duty of further inquiry under section 224.2, subdivision (e). The social worker tried to call Trinidad, but the number provided by Father was no longer in service. The social worker also left voicemail messages for Barbara. But there is no evidence the social worker made any further efforts to reach Trinidad or Barbara. The social worker could have followed up with Father or other paternal relatives to obtain a correct phone number for Trinidad, and residence or email addresses for Trinidad and Barbara. Further, the social worker could have, but did not, contact other paternal relatives to obtain additional information on Victoria's possible Indian ancestry.

B.    *Substantial Evidence Supports the Removal Order*

"'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to

15

protect the child's physical health without removing the child.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065; accord, *In re G.C.* (2020) 48 Cal.App.5th 257, 265; see § 361, subd. (c)(1).) The juvenile court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).) "In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332; accord, *In re N.M.* (2011) 197 Cal.App.4th 159, 170.) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.'" (*N.M.*, at pp. 169-170; accord, *In re V.L.* (2020) 54 Cal.App.5th 147, 154.)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020)

16

9 Cal.5th 989, 1011-1012; accord, *In re V.L., supra*, 54 Cal.App.5th 147, 155 ["*O.B.* is controlling in dependency cases"].)  We review the entire record to determine whether the removal order is supported by substantial evidence.  (*V.L.*, at p. 155; *In re D.B., supra*, 26 Cal.App.5th at pp. 328-329; see *O.B.*, at p. 1011.)

Substantial evidence supports the disposition order removing Victoria from Mother's physical custody.  Victoria was afraid and did not feel safe with Mother because of Mother's untreated paranoid schizophrenia.  As a result of Mother's paranoia, Mother locked Victoria in their shared bedroom and falsely accused maternal relatives of sexually abusing Victoria.

Mother contends there were reasonable alternatives to the disposition order removing Victoria from her custody such as a home of parent order with family preservation and wrap around services, or alternatively, an order allowing Mother to reside with Victoria and the maternal grandparents.  But neither alternative to removal was reasonable or feasible under the circumstances.  Although Mother was receiving mental health services, she was again hospitalized for mental health issues on January 27, 2020.  Further, Mother reported to the social worker that Mother worked for a family and lived in their home.  Given Mother's unresolved mental health issues and existing living arrangement, a home of parent order was not a reasonable alternative.

Likewise, living with Victoria in the maternal grandparents' home was not a reasonable alternative to removal.  Victoria, Mona, and Michael were opposed to Mother living with them.  Further, Mona and Michael previously were unable to protect Victoria from Mother when Mother locked Victoria in the bedroom with her.  Moreover, although Mother's relationship

17

with Mona and Michael had improved, Mother previously assaulted them for no apparent reason when Mother and Victoria lived with them. After Mother moved out, she twice attempted to enter Michael and Mona's apartment without permission, one time after Victoria had been placed with the grandparents, in violation of the restraining order against her. Substantial evidence therefore supports the juvenile court's finding there was substantial danger to Victoria's physical health, safety, and emotional well-being if returned to Mother's physical custody, and there were no reasonable means to protect Victoria's physical health and emotional well-being without removing her from Mother's custody.

C.    *The Juvenile Court Did Not Abuse Its Discretion in Ordering Monitored Visitation*

"A disposition order granting reunification services must provide for visitation between a child and parent 'as frequent as possible, consistent with the well-being of the child.' (§ 362.1, subd. (a)(1)(A).) In addition, section 362.1 mandates '[n]o visitation order shall jeopardize the safety of the child.' (§ 362.1, subd. (a)(1)(B).)" (*In re T.M.* (2016) 4 Cal.App.5th 1214, 1218; accord, *In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1100-1101.) "The power to regulate visits between dependent children and their parents rests with the juvenile court and its visitation orders will not be disturbed on appeal absent an abuse of discretion." (*In re D.P., supra,* 44 Cal.App.5th at p. 1070; accord, *In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.)

Mother contends the juvenile court abused its discretion in granting Mother only monitored visitation. Given Mother's

18

unresolved mental health issues and Victoria's fear of Mother, there was no abuse of discretion.

## DISPOSITION

We conditionally affirm the disposition orders. We remand for the juvenile court and the Department to comply with the inquiry and notice provisions of ICWA and state law.

FEUER, J.

We concur:

SEGAL, Acting P. J.

DILLON, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.